# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

DRIPS HOLDINGS, LLC, a Delaware
limited liability company

                Plaintiff,

    v.

TELEDRIP LLC, f/k/a DRIPS. IO, a
Delaware limited liability company,
TAYLOR MURRAY, JOHN BUDD,
and ~~DOES 1 through 5,
inclusive~~MICHAEL LAIBLE

            Defendants.

CASE NO.: 5:19-CV-02789

JUDGE JOHN R. ADAMS

**~~THIRD~~FOURTH AMENDED
COMPLAINT FOR:**

(1) Federal Trademark Infringement
(2) Federal Unfair Competition and
    False Advertising
(3) Federal Cybersquatting
(4) Ohio Statutory Unfair Competition
    and False Advertising
(5) Ohio common law tortious
    interference with Business
    Relationship
(6) Ohio common law Business
    Disparagement
(7) Ohio Statutory and common law
    Deceptive Trade Practices
(8) Ohio Statutory Misappropriation of
    Trade Secrets
(9) Violation of the Defend Trade
    Secrets Act

**JURY TRIAL DEMANDED**

Plaintiff DRIPS HOLDINGS LLC ("Drips Holdings" or "Plaintiff"), for its ~~Third~~Fourth Amended Complaint ("Complaint") against Defendants TELEDRIP, LLC, f/k/a Drips.io ("Teledrip"), ~~and~~TAYLOR MURRAY, JOHN ~~DOES 1-5~~BUDD, and MICHAEL LAIBLE (collectively, "Defendants") alleges as follows:

**PRELIMINARY STATEMENT**

This is an action for, *inter alia*, trademark infringement, including unfair competition and false advertising under the Lanham Act, 15 U.S.C. §1051, *et seq.*, cybersquatting under 15 U.S.C. §1125(d), as well as misappropriation of trade secrets pursuant to Ohio Rev. Code §§ 1333.61 – 1333.69 and 18 U.S.C. 1836, and unfair trade practices pursuant to Ohio Rev. Code §§ 4165.01-2, *et seq.* and Ohio common law for unfair competition, tortious interference, business disparagement, deceptive trade practices, and trade secret misappropriation.

## I.     <u>INTRODUCTION</u>

1.     This action arises out of Defendants' brazen and illegal scheme to deceive the relevant public into thinking that Defendants are affiliated with or are the same as Plaintiff or, failing that, convince the public that their services are superior to Plaintiff's using false statements of fact.

2.     Plaintiff only recently realized the scope and extent of Defendants' unfair conduct, having been informed by Teledrip's then-CEO about Teledrip's deliberate targeting of Drips Holdings, and brings this lawsuit now to address

}.

Defendants' progressive encroachment upon Plaintiff's valuable rights and failure to stay a safe distance once it gained a foothold in Plaintiff's niche industry through acts of unfair competition.

4.     Using Plaintiff's proprietary UI (user interface) layout consisting of AI-assisted SMS lead generation services, Defendants launched a directly competing business platform. Defendants also have been mimicking Plaintiff's name, website, logo, and marketing to confuse the public, and trade off Plaintiff's goodwill and industry respect in order to unfairly divert customers to Defendants.

5.     Through Defendants' acts of deception, misappropriation, and other unfair business practices, Defendants built a business by tricking potential customers and others in the industry into thinking that they are dealing with Plaintiff when in fact they are not. Defendants benefitted economically through this trickery, causing substantial financial and business harm to Plaintiff, and generating irreparable confusion in the marketplace that persists to this day.

6.     Upon information and belief, this unlawful scheme originated with and was concocted by Defendant Taylor Murray ("Murray") (who Plaintiff just recently learned shortly before filing this action also goes by the alias "Dinesh Singh"), who colluded to conduct business under the name "drips.io" (a blatant rip off of Plaintiff's name and web identity) and later "teledrip.com", used Plaintiff's proprietary UI layout, copied Plaintiff's brand and marketing style, and took other affirmative steps to

deceive the public into

believing that he (and the company) were Plaintiff or affiliated with Plaintiff, for the purpose of unlawfully cashing in on Plaintiff's success. ~~Defendants Does 1-5 aided and abetted Murray's scheme.~~

7.    Defendant John Budd ("Budd") is a former client of Drips who helped Murray build the Teledrip platform in exchange for a percentage membership in Teledrip.

8.    Defendant Michael Laible ("Laible") is a Teledrip member as well as its current CEO who has intentionally targeted and made false and misleading statements about Drips during his direct and email marketing of Teledrip's services.

9.    ~~6.~~Defendant Teledrip uses a work flow system for its services that is a substantively exact copy of Drips *internal* campaign building systems, which were not publicly available; this is despite the fact the such work flow system could have been designed literally thousands of different ways and, upon information and belief, no competitors use a similar work flow system.

10.    ~~7.~~Plaintiff only recently has been advised, and upon information and belief alleges, that Teledrip engages in conduct known in the industry as the use of "dirty leads," which could also violate the Telephone Consumer Protection Act (47 U.S.C. § 227, *et seq.*) and has the common and foreseeable result of causing diminution to reputation and to good will.

11.    ~~8.~~Upon information and belief, the use by Teledrip of "dirty leads"

under the circumstances described in this Complaint (*i.e.*, where Teledrip has sought to intentionally cause consumer confusion between Teledrip and Drips Holdings) has harmed the reputation and goodwill of Drips Holdings.

12.    Defendants attend the same trade shows as Plaintiff and have made disparaging comments about Plaintiff at them and otherwise interfered with Plaintiff's business relationships with its customers and prospective customers.

13.    10As a result of Defendants' illegal and bad faith actions, Plaintiff suffered and continues to suffer a loss of the goodwill created in its service marks and brand, as well as lost profits from the sale of products and services diverted to Defendants. This action seeks permanent injunctive relief and damages against Defendants for willful infringement of Plaintiff's proprietary rights, intellectual property rights and unfair competition against Plaintiff using lies and deception resulting in an enterprise engaged in corrupt activity.

## II.    JURISDICTION AND VENUE

14.    11Jurisdiction is proper in the Court pursuant to 15 U.S.C. §§ 1117 and 1121, 18 U.S.C. § 1836, and 28 U.S.C. §§ 1331 and 1338, in that this Complaint raises federal questions under the Lanham Act, 15 U.S.C. § 1051 *et seq*. and the Defend Trade Secrets Act, 18 U.S.C. §1831 et seq. Supplemental jurisdiction over the state law claims is proper in this Court pursuant to 28 U.S.C. § 1367.

15.    12Personal jurisdiction over Budd is proper because he is an Ohio resident.

16.    Personal jurisdiction over the remaining Defendants is proper under Ohio Rev. Code Ann. § 2307.382(A)(1), (3), (4) and (6), as well as the Court's pendent jurisdiction, because Defendants have purposefully transacted business in this state, contracted with an Ohio resident to obtain Plaintiff's confidential information; engaged in tortious activity intentionally directed at an Ohio business

8

and used service marks that are confusingly similar to Plaintiff's service marks in Ohio and/or direct or have the right and ability to supervise the infringing activity and maintain a direct financial interest in such activities.

17.    11Personal jurisdiction over Defendants is also proper because they have purposefully engaged in tortious and deceptive activities directed specifically at Plaintiff, which they know resides in Ohio and feels the effects of Defendants' activities in this state, and these claims arise out of those tortious and deceptive activities.

18.    11Personal jurisdiction over Defendants is proper because they have purposefully availed themselves of the opportunity to conduct commercial activities in this forum. The Complaint arises out of those commercial activities.

19.    15Venue is proper in this district under 28 U.S.C. §§ 1391 (b) and (c) in that substantial injury occurred and continues to occur in this district, a substantial portion of the events that are the subject of this action took place in this district, and Defendants are subject to personal jurisdiction in this district.

### III.    **PARTIES**

20.    16DRIPS HOLDINGS LLC is a Delaware limited liability company with its principal place of business in Akron, Ohio. The company formed in August 2017 and, at that time, succeeded to all the assets (including, but not limited to, intellectual property rights) owned by its parent company, Lead Science LLC. For the purposes of this Complaint, the business operated prior to August 2017 by Lead Science LLC and after August 2017 by Drips Holdings LLC, is referred to herein as "Drips Holdings."

21.        17.TELEDRIP, LLC is a Delaware limited liability company with, upon information and belief, no established principal place of business. The Delaware address provided to the Delaware Secretary of State and identified on Teledrip's website as its place of business is actually a single-story clapboard house that is the address of record for Harvard Business Services, Inc., Defendant Teledrip's agent for process of service. Based on the records of the Delaware Secretary of State, Teledrip was formed in or around March 2017.

22.        18.TAYLOR MURRAY is an individual residing in California who represents himself as an "internet entrepreneur" and founder of multiple internet companies. Murray also is the co-founder of "nerdcore" hip hop group "Spamtec" aka "STC" under the performer name "phlow."

23.        19.Defendants John Does 1-5 are sued herein under fictitious names because their true names and capacities are unknown at this time. Upon information and belief, John Does 1-5 are the owners, members, managers, and/or officers of Teledrip, who performed the acts complained of herein and/or had the right and ability to supervise the conduct of those who performed the acts complained of herein. This Complaint will be amended when their true names and capacities are ascertained.JOHN BUDD is an individual residing in Ohio who is a former client of Drips who helped Murray build the Teledrip platform in exchange for a percentage

membership in Teledrip (which he later sold to another Teledrip member at a significant profit).

24.     MICHAEL LAIBLE is an individual residing in Florida, who who is a Teledrip member as well as its current CEO. Laible is responsible for repeatedly making false and misleading statements about Drips, including in marketing emails and during trade conferences, despite (by his admission) having no factual basis for those statements.

IV.   **FACTUAL BACKGROUND**

A.   **The Drips Business and the Drips Service Marks**

25.   20.Drips Holdings specializes in providing its customers the ability to communicate with consumers through various proprietary means, including sending and receiving text/SMS messages to or from groups or individuals by using a ten-digit phone number and/or short code set-up along with other innovative, proprietary technology-based artificial intelligence methods (the "Drips Services"). The Drips Services assist Drips Holdings' customers to capture attention of and maintain relationships with consumers.

26.   21.Drips Holdings' founder began creating its software code in mid-July 2014. Over the next year and a half, he continued revising and improving upon the software along with another developer, spending countless hours. Plaintiff ran into countless real-world issues that required solving for: *What if the user hangs up when they answer the phone? What if the lead comes in at midnight? What if the business is closed? What if the user doesn't pick up the scheduled call? What if the user gets disconnected? What if the user requests a call when the business is closed?*

27.   22.The style of Plaintiff's UI (columns with cards within the columns) that Plaintiff conceived for using as a drip campaign builder is not a common or simplistic style of scheduling. Plaintiff was unique in adapting the look and this

organizational style and considers it to be proprietary. After many iterations,

Plaintiff pioneered what it believed to be the most efficient methodology by doing an outbound conversational drip campaign with the sole goal to elicit a response. These responses then bring the user into conversation mode, triggering the Auto responder FAQ (frequently asked questions), Plaintiff's AI (natural language processor), or when needed in about 1-1.5% of cases, live chat operators to respond to the user and ultimately schedule a call with them.

28. 23. Plaintiff built its most recent methodology after going through 3 other styles of systems that it used extensively. It eventually landed on the ideal UI after literally thousands of code additions/revisions. There are a multitude of methodologies on how to handle the numerous edge cases and variances in how and when a user can engage. The parties' competitors in this niche industry operate using a wide range of UIs, as would be expected when independent programmers work through the variables to create their own AI-driven programs.

29. 24. Launched in 2015 with just a handful of employees, Drips Holdings now has a staff of more than 70 and handles millions of messages for its clients each day.

30. 25. Drips Holdings owns and has operated a website at www.drips.com since at least March 2015. Since at least February 2016, Drips Holdings has used

the following service mark, a logo consisting of stylized letters "d" and "p" evoking droplets:[1]

(the "Drips Mark")

31.    ~~26.~~In addition to the Drips Mark, since at least March 2015, Drips Holdings has advertised itself as "Drips.com." (the "Drips.com" Mark).

32.    ~~27.~~Drips Holdings also owns U.S. Reg. No. 5859200 for CONVERSATIONAL SMS in International Class 035 for use in connection with "Advertising and marketing services, namely, promoting the goods and services of other" (the "Conversational SMS Mark").

_____

33.    ~~28.~~Collectively, the Drips Mark, the Drips.com Mark, and the Conversational SMS Mark are the "Drips Service Marks."

34.    ~~29.~~Since March 2018, Drips Holdings has been and is the owner of the exclusive right, title, and interest in the website www.Drips.com and the Drips Service Marks, with full and exclusive right to bring suit to enforce its trademark rights, including the right to recover for past infringement.

_____

[1] Earlier versions of the DRIPS design logo predated the current version featured above.

18

35.    34.The Drips Service Marks are arbitrary and thus entitled to the maximum trademark protection, and/or have attained secondary meaning.

36.    35.“DRIP” is an acronym for a communication model (Differentiate, Reinforce, Inform, Persuade) that has been employed in the marketing field but does not describe a particular type of product or service.[2] There is no “drip marketing” field of services.

37.    36.The Drips Service Marks are unique in this niche industry. Upon information and belief, of Plaintiff's around thirty competitors, none of them (other than Defendant Teledrip) uses the terms “drip” and/or “conversational SMS” in their

company name or on their home pages to advertise their competing services of AI-driven text messaging.

38.    37.The one other third-party competitor that entered the market under a DRIP-formed name stopped its infringing use following Drips Holdings' cease and desist demand.

---

[2] Along the same lines, the acronym AIDA is used for another communication model (Attention or Awareness, Interest, Desire and Action) that is used in marketing and serves as a registered trademark for Sitecore Corporation in International Class 009 for “Computer software for the collection, evaluation, management and analysis of customer patterns, behaviors, and decisions as gathered from various digital channels, namely, web, email, mobile, and social networking mediums; Business analytics software in the field of sales and marketing which uses artificial intelligence to suggest and implement recommendations for operational improvement; Business management software to evaluate customer conversion rates, suggest means of improvement, and implement solutions to improve customer conversion” (U.S. Reg. No. 4625249).

20

39. 34.The relevant industry quickly noticed Drips Holdings and the Drips Service Marks because of the novel approach to digital marketing created and implemented by Drips Holdings using Drips Holdings' proprietary AI-driven model.

40. 35.Additionally, for several years prior to the events giving rise to this lawsuit, Drips Holdings spent enormous amounts of time, money, and effort advertising and promoting the Drips Service Marks. To date, Drips Holdings has spent more than one million dollars on marketing and promotion of the Drips Service Marks.

41. 36.Drips Holdings' products and services are advertised at numerous trade shows, in print, and on the Internet using the Drips Service Marks.

42. 37.For the past three years, Drips Holdings maintains a booth at more than ten trade shows per year. Drips Holdings' founder and CEO presented to tens of thousands of industry participants at these trades shows, including LeadsCon and Connect to Convert, the largest trade shows in the industry. Trade shows are an essential promotional tool in the digital marketing industry to develop and cultivate customer leads and sell services.

43. 38.The Drips Services are advertised, promoted and presented at points of sale online using the Drips Service Marks, including digital advertising, industry blogs, social media, trade conferences, corporate philanthropy events, sponsorships, client summits, client dinners, client and industry panels/presentations, and

promotional videos. In August 2015, Drips Holdings created a video introducing and explaining its pioneering methods and promoted the video using a variety of outlets, including social media, the www.drips.com website, and YouTube found at

https://www.youtube.~~com~~com/watch?v=0twktlHud-w, receiving thousands of views. Customers, accordingly, view the Drips Service Marks in a variety of sale and advertising contexts.

44.    ~~30.~~To create and maintain goodwill among its customers, Drips Holdings takes substantial steps to ensure that its products and services are of the highest quality in terms of effectiveness, reliability, and compliance. Drips Holdings invested substantial amounts in its people and systems to ensure Drips Services are available to customers on demand. Drips Holdings maintains high standards of compliance with state and federal statutes governing advertising to consumers.

45.    ~~40.~~As a result of its superior services and sales and marketing efforts, Drips Holdings' revenue increased from one million dollars in 2016, to breaking eight

figures in 2018. A March 31, 2019 article on Inc.com acknowledges that Drips Holdings is "one of the nation's fastest-growing SMS marketing platforms." Drips Holdings was also recently named to the Deloitte Technology Fast 500, an audited list of the 500 fastest growing public and private companies in the technology, media, telecommunications, life sciences, and energy tech sectors; Drips Holdings

was named THE fastest growing company in Ohio, 1st in the Midwest and 20th fastest

overall in North America. Additionally, Drips Holdings was one of only four privately held companies in the top 100.

46.  In August 2019, the founder and CEO of Drips Holdings received praise by leading industry publication DMNews.com as one of the top "40UNDER40" change makers and pioneers in the direct and digital marketing industry and countless unsolicited mentions in the relevant press.

47.  Drips Holdings actively polices and enforces its rights in the Drips Service Marks.

48.  Based on Drips Holdings' extensive marketing of its brand, the Drips Service Marks have acquired strong secondary meaning so that any product or advertisement bearing such mark is immediately associated by the trade as a product or affiliate of Drips Holdings.

**B.  Defendants' Infringing and Improper Conduct**

49.  The Contact.io trade show of January 19-20, 2016 in San Francisco, marked Drips Holdings' debut before approximately 500 marketers, entrepreneurs, and technology leaders spanning some of the largest sectors of the economy from financial services, healthcare, home services, professional services, and travel, all focused on the call marketing ecosystem. Drips Holdings, the talk of the town at the trade show, gained three key accounts as a result of its efforts. Following Contact.io, Drips Holdings received an exponentially greater number of customer inquiries.

50.    45.As Drips Holdings' popularity grew, so too did the incentive to copy its business format and intellectual property.

51.    46.The domain name "drips.io" was anonymously registered on or around December 28, 2016. Upon information and belief, Murray was responsible for choosing and registering the drips.io domain name.

52.    47.Murray is an individual, whose place of residence is believed to be in California, and is a founder of Teledrip, who concocted and implemented the unlawful scheme to rip off Drips Holdings, to start doing business under the deceptively similar name "drips.io," and to take the other actions described in this Complaint alone and at times in concert with Defendants Does 1-5.

53.    48.Murray has used the alias "DINESH SINGH" to interact with consumers and the industry on behalf of Teledrip in order to convey the false idea to others that such an individual existed and was a founder of Teledrip and to hide his true identity from the industry and, in particular, Drips Holdings. Upon information and belief, Murray also has employed a series of other persons as the Chief Executive Officer of Teledrip to further hide his true identity and involvement in Teledrip from the public and, more specifically, from Drips Holdings and the digital marketing industry.

54.    49.Upon information and belief, Murray collectively owns the vast majority of shares in Teledrip (approximately 85%) and has personally lined his

25

pockets with improperly obtained wealth generated through his ownership in Teledrip and its improper and unlawful business practices, which were known to and advocated by him. Upon information and belief, his intent to conduct Teledrip as a fly-by-night operation is exemplified by stripping all profit from Teledrip on a monthly basis rather than investing in growing the company through legitimate means.

55. 50. Defendant Teledrip was founded by Murray with a singular goal in mind – ride the coattails of Drips Holdings by offering a UI layout that is a copy of Drips Holdings' internal and proprietary workflow. There are countless ways to develop a workflow and UI that would accomplish the same result, as demonstrated by the fact that the parties' other competitors all have much different UIs.

56. 51. Rather than develop a brand and marketing, Teledrip also copied Drips Holdings' branding and marketing, including the terms, colors, and themes used by Drips Holdings.

57. 52. Upon information and belief, Teledrip launched its business under "Drips.io" more than a year after Drips Holdings' own launch.

58. 53. Drips Holdings learned shortly before filing this action that the "Taylor Murray" associated with Teledrip is the same Taylor Murray who has long been known to Drips Holdings' founders as a close associate of two persons who, during 2014-2016, had access to Drips Holdings' platform as it was under development,

27

tested, and then successfully launched, and who became customers of Drips Holdings. They both executed an "Access Agreement to Data Transmission," agreeing "not to access, copy, or otherwise use Lead Science Services" unless such use was authorized.

59. ~~54.~~Murray told at least one other person that he used Teledrip to seek revenge on a Drips Holdings' co-founder. Murray personally knew Drips Holdings' co-founder, knew he (and Drips Holdings) resided in Ohio, and believed he had caused harm to one of the aforementioned mutual friends (who himself at all operative times was residing in Ohio).

60. ~~55.~~Murray exploited the feelings of resentment the other mutual friend, John Budd (who also at all operative times was residing in Ohio) held against Drips Holdings' co-founder(s).

61. ~~56.~~Murray obtained confidential information of Drips Holdings through ~~this association with the Ohio resident/company,~~John Budd including ~~upon information and belief~~ detailed feedback regarding Drips' proprietary workflow, confidential customer pricing information, customer and industry insights, customer scripts, and actual screenshots of Drips' user interface, that he then used to quickly develop his copycat "drips.io" platform.

29

62. ~~57.~~Upon information and belief, from the time the drips.io platform launched in December 2016 until mid-2017, ~~Mr.~~ Budd's company, Element Networks LLC (formed and residing in Ohio), was Teledrip's sole customer.

63. ~~58.~~At the same time Element Networks was a Drips Holdings customer, using the Drips Holdings platform and having access to Drips Holdings' reports, Mr. Budd was helping Mr. Murray build the Teledrip platform using information he obtained through Drips Holdings.

64. Budd provided Murray with copies of Drips' customer scripts, which are provided for use solely with the Drips platform. Teledrip then used the Drips scripts provided by Budd to create template scripts for use by Teledrip customers.

65. ~~59.~~Upon information and belief, Murray knew that Element Networks was a Drips Holdings customer during this period of time and induced Mr. Budd to breach his Access Agreement with Drips Holdings.

66. ~~60.~~In exchange for the confidential Drips Holdings' information provided to Murray by Mr. Budd and due to the importance of the information provided by Mr. Budd, Mr. Murray directed that Element Networks be financially compensated.

67. ~~61.~~Teledrip launched in 2017 using the user interface debuted in Drips Holdings' fourth version of its code (with all its attendant learnings incorporated) shortly after Drips Holdings' release. It is simply unfathomable that Teledrip could

create and run a platform using this same UI without having had access to Drips Holdings' code and other non-public information.

68.    61.Upon information and belief, Defendants' infringing actions conceived of, conducted by, and/or overseen by Murray include copying or otherwise scraping

content directly from Plaintiff's website www.Drips.com, including the similar look and feel of the website, and deploying its copycat website at www.Drips.io.

69.    ~~62.~~Indeed, aside from the similar background and color schemes on both websites, the website favicons and trademarks are confusingly similar, with Defendants featuring blue droplets mimicking Drips Service Marks:

70.    ~~64.~~Drips Holdings' discovered "Drips.io" in January 2017 and immediately sent a cease and desist letter.

71.    ~~65.~~Caught red-handed, Defendants agreed to stop using the drips.io website via an anonymous email from info@drips.io. At that time, Plaintiff took no further legal action, deciding to invest its scarce resources in its software development and marketing and sales.

### C.    Teledrip's Encroaching Infringement and Failure to Stay a Safe Distance From Drips Holdings' Rights

72.    ~~66.~~Defendant Teledrip was founded in or around March 2017 by Murray and three other individuals. Only one of those individuals, who was a highly-

regarded and decorated military veteran with no prior knowledge of the digital

marketing industry, was used to interact directly with customers as the front man to allow for a cloak of anonymity and respectability as Murray operated Teledrip from the shadows.

73. 67.Defendant Murray has exercised complete dominion and control over Teledrip's operations, including dictating what the Teledrip platform would look like and do, creating the look and feel of Teledrip's website, trade show materials, and other marketing materials, and exercising exclusive control over Teledrip's financial operations.

74. 68.Murray chose the name "Teledrip" in order to ride the coattails of Drips Holdings, which was already well-known in the industry and the only company providing AI-enabled SMS services.

75. 69.Teledrip specifically targeted Drips Holdings' existing clients and industry contacts to sell Teledrip's services.

76. 70.In May 2017, Murray instructed his front man to start networking in the industry by using a special application to copy the contacts listed on the LinkedIn profile maintained by Drips Holdings' CEO and co-founder.

77. 71.In July 2017, a customer that Teledrip was trying to poach from Drips Holdings introduced one of Drips Holdings' founders (who knew Taylor Murray) to "Dinesh Singh" as Teledrip's CEO via email and, when Drips Holdings suggested a

telephone call (during which Murray's true identity would have been recognized), "Dinesh Singh" turned the discussion over to his front man.

78.     ~~77~~Following this email exchange with Drips' Holdings, Teledrip officially hired its front man as the Director of Business Development but presented him to the public as Teledrip's CEO.

79.     Despite having a CEO, Murray retained control of Teledrip and exercised the powers of a Chief Executive Officer, including, for example, sending emails from his CEO's email address without the knowledge and consent of the putative CEO.

80.     ~~78~~After Teledrip's founding member CEO raised compliance issues ~~and~~, refused to take on questionable (non-compliant) accounts and questioned Teledrip's accounting practices, there was a falling out and the former CEO left Teledrip and Defendant Murray promoted another employee, Michael C. Laible, to the position of CEO to maintain his behind-the-scenes control of the company.

81.     ~~79~~~~Michael C. Laible ("Laible") is an individual residing in Florida,~~ ~~who~~Laible is the former Chief Revenue Officer/lead salesperson and member and current ~~Chief Executive Officer of Teledrip. Mr. Laible holds himself out on social media as~~ Chief Executive Officer of Teledrip and thus, is a participant in and holds a direct financial interest in the proceeds of Teledrip's unlawful acts described herein.

82.     ~~80~~Defendant Teledrip has only a handful of employees, most of whom are the company owners and founders.

83.    76.Teledrip knowingly obtained possession of and used Drips' customer scripts, which are created by Drips following multiple iterations and analyses to

reach a script that is optimized to get the recipients of the messages to speak with Drips' customers.

84. 77.Drips takes reasonable actions to maintain the confidentiality of its scripts, including written agreements with customers prohibiting unauthorized use of Drips' materials.

85. 78.Upon information and belief, Teledrip knew or should have known that Drips' scripts were Drips' confidential property because Teledrip was told by customers to not let it be known that the customer was providing Drips' scripts.

86. 79.Having already gained an unfair advantage in the marketplace through its misappropriation and copying, Teledrip continued using marketing materials that mimic the colors, layout, and themes of Drips Holdings' materials. Teledrip's minor changes did not resolve consumer confusion in the marketplace. Teledrip failed to keep a "safe distance" from Drips Holdings and its valuable intellectual property rights and indeed, it continues to encroach unfairly upon those rights.

87. 80.Despite dropping its www.drips.io domain name for www.teledrip.com, Teledrip has taken every opportunity to blur the line between its company and Drips Holdings in the eyes of the relevant public.

88. 81.Murray is responsible for designing and writing Teledrip's marketing pieces, including the ones complained of herein.

60.    42. For example, Plaintiff heavily used images of graph paper, pens, pencils, succulents, and coffee cups in its "touch points" materials for customers in every case study, every proposal, every flyer, etc., and Teledrip's own advertising materials soon adopted these visual elements:

90.     81.The format of the Teledrip homepage, including the use of bands of

blue, gray, and white, and use of the same and similarly colored ovals, is easily

recognized by viewers as expected variations of the format, color, and iconography used

by Drips Holdings on its website:

91.    84.Teledrip even uses a thumbnail when embedding its promotional video (which itself uses a similar animation style to Drips Holdings' 2015 video) that closely resembles a widely-used frame from Plaintiff's 2015 video:

92.     85.Teledrip's trade show marketing materials (as illustrated below) are rip- offs of Plaintiff's marketing materials. For example, Defendant Teledrip's booth materials (shown below) include a summary of Plaintiff's 2015 marketing video, only making minor changes like changing "Jane" to "John" and "5:15 pm" to "6 pm" in a sample script. *See* https://www.youtube.com/watch?v=T03kHb6aQwY&t=1s; https://www.youtube.comcom/watch?v=0twktlHud-w&t=3s.

93. 86.Multiple customers who view Drips Holdings' booth are confused and believe there is a relationship or association between Drips Holdings and Teledrip because of the similar colors, layouts, and themes used by Teledrip.

94. 87.Teledrip actively encourages the confusion. For example, Teledrip blatantly outsources technical sales issues to Drips Holdings. At a trade show in 2017, a Teledrip representative asked a potential customer to go to Drips Holdings for an explanation of API integrations and then return to Teledrip so they could (paraphrasing) "take it from there."

95. 88.This type of intentional conflation of the two companies is not sporadic or inadvertent. At a trade show event in 2018, while in a group of attendees, Laible was asked if he was "with" Drips Holdings and, instead of correcting that misunderstanding, Laible allowed the entire group of attendees to believe an association exists between the parties.

96. 89.At trade shows attended by both Drips Holdings and Teledrip, Drips Holdings' sales and leads are less than reasonably expected.

97. 90.Defendants continue to evolve Teledrip's marketing and promotion efforts to ride Drips Holdings' coattails. For example, at some point between September 9, 2018 and November 6, 2018 and several months after Drips Holdings started use of its CONVERSATIONAL SMS service mark, Teledrip updated its

website to prominently include Drips Holdings' CONVERSATIONAL SMS service mark.

98.    91.Drips Holdings learned in the last year that even after Teledrip transitioned to "Teledrip.com" from "Drips.io," customers remained confused. For example, a major customer with which Drips Holdings does business – but from whom it has not gained expected traction – recently informed Drips Holdings that despite management's support, lower-level employees with day-to-day decision-making authority were doing business with Teledrip because they believe the companies are related. Absent Teledrip's interference, Drips Holdings reasonably expected earnings of more than $100,000 per month from this customer alone.

99.    92.Multiple industry contacts, including a customer and multiple high-level members of one of the most highly regarded professional organizations in the field, informed Drips Holdings that people genuinely think Teledrip is the same as or a related company to Drips Holdings.

100.    93.The sale and advertising of Teledrip products and services is likely to cause and has in fact caused confusion among consumers regarding Drips Holdings' sponsorship of, affiliation with, connection to, or approval of the products and services sold by Teledrip.

101.    94.Teledrip's infringing sales and advertising further interfere with Drips Holdings' ability to control the perception of the quality of products and service

offerings bearing the Drips Service Marks, which is essential in this heavily regulated and litigated industry. Upon information and belief, Defendant Teledrip has developed a negative reputation in the industry as a "spam mill," creating negative goodwill which confused consumers and others in the industry are likely to transfer to Drips Holdings.

102. 95.In addition to similar advertising materials, Teledrip intentionally, willfully and deliberately uses Drips Holdings' proprietary UI layout, website content and verbiage to mislead and confuse consumers into believing that Teledrip's goods are supported, sponsored or approved by Drips Holdings.

103. 96.As a result of Teledrip's actions, Drips Holdings is suffering a loss of the enormous goodwill that it created and is losing profits to Teledrip from lost sales of Drips Holdings' products and services.

## D. Teledrip's Interference with Drips Holdings' Customers

104. 97.Upon information and belief, because Drips Holdings is the industry leader in its field, customers and potential customers engaging with Teledrip frequently want to know how Teledrip compares to Drips Holdings.

105. 98.An established element of Teledrip's standard pitch to these potential customers includes false statements negatively reviewing Drips Holdings' technological capabilities.

106.    90.This yearPrior to filing this action, Drips Holdings learned that Teledrip's sales agents, including Laible, have told multiple customers and potential customers of Drips Holdings that (unlike Teledrip) Drips Holdings does not use AI (artificial intelligence) or any real technology and instead relies entirely on overseas human call centers (which have a pejorative connotation in the marketing field). These statements are false.

107.    During deposition, Laible admitted these statements were pure "speculation" on his part.

108.    As a regular part of his marketing communications for Teledrip, Laible also repeatedly stated that Teledrip has never lost a head-to-head competition to Drips.

109.    In fact, Laible was aware that, after trying out Teledrip's platform, many customers have concluded that Teledrip's offerings fall short of Drips' services.

110.    Laible had no reliable evidence upon which to claim that Teledrip "never lost" to Drips when he made the foregoing statements.

111.    Upon information and belief, customers relied upon Laible's representations regarding Drips when deciding to try out Teledrip's services.

112.    At a trade show in 2019, Laible responded to a question posed by an enterprise prospect who was confused about a relationship between Drips and

Teledrip, "we are all part of the same family."

113.    Upon information and belief, Laible regularly makes false and misleading factual statements about Teledrip, Drips, and their respective services to potential customers when he lacks any reliable evidence for doing so.

114.    At the time he made the foregoing statements, Laible knew Drips, knew that it was Teledrip's primary competitor and, upon information and belief, knew that it was an Ohio-based company.

115.    100.Because of Teledrip's prior infringing use of "Drips.io" and continued use of the misappropriated UI layout and copycat marketing materials, industry participants (including customers, competitors, and other members of professional organizations that Drips Holdings participate in) who believe there is or was at one

time a relationship between Teledrip and Drips Holdings give added credibility to Teledrip's false statements regarding Drips Holdings' technology.

116.    101.There is no factual basis for Teledrip to make any statements regarding Drips Holdings' technology, let alone the blatantly false statements Drips Holdings learned it is making.

117.    102.Upon information and belief, consumers who are confused into believing that there is an association between Teledrip and Drips Holdings view Teledrip as Drips Holdings' new, more advanced offering.

118.    103.Upon information and belief, consumers who are not duped by

46

Teledrip's attempts to create a false association with Drips Holdings believe that Teledrip's services are superior to Drips Holdings' services.

119. ~~104.~~Teledrip successfully used false statements comparing Teledrip's and Drips Holdings' technology to convince Drips Holdings' customers and potential customers to hire Teledrip instead of Drips Holdings.

120. ~~105.~~For example, one existing customer of Drips Holdings tested Teledrip's services recently, during which time Drips Holdings' volume for that client was cut in half. Even though the customer returned to Drips Holdings, Drips Holdings lost an estimated $20,000. Upon information and belief, this customer tested Teledrip's services due to Teledrip's false statements regarding Drips Holdings.

121. ~~106.~~As a result of Teledrip's actions, Drips Holdings is suffering a loss of enormous goodwill and is losing profits from lost sales and lost potential sales of its products and services.

122. ~~107.~~Defendants are likely to continue to commit the acts complained of herein, and, unless restrained and enjoined, will continue to do so, causing Plaintiff irreparable harm.

**E.    Defendants' Continued Bad Faith Use of the Drips Service Marks**

123. ~~108.~~In late May 2020, Plaintiff learned, through the act of an employee accidentally omitting the "o" from its web address, that someone had registered the domain name "drips.cm" (the "Infringing Domain") and has it pointed to

automatically redirect users seeking Plaintiff's website found at www.drips.com to

www.teledrip.com.

124.   100.Upon information and belief, Defendants or someone acting on their behalf registered the Infringing Domain on or around December 19, 2018.

125.   110.At the time the Infringing Domain was registered, Defendants knew of Plaintiff's Drips Service Marks, including drips.com.

126.   111.The .cm domain is a country-level domain that is assigned to the nation of Cameroon.

127.   112.Upon information and belief, Teledrip has no association with or business interests in Cameroon.

128.   113.Cybersquatters frequently register .cm domains for the purpose of diverting traffic from legitimate .com domains in a practice commonly referred to as "typosquatting."

129.   114.Upon information and belief, Defendants have the Infringing Domain registered anonymously using a Chinese company that helps domain owners hide their identity on the publicly available Whois directory.

130.   The person believed to have registered the drips.cm domain name is, upon information and belief, a longtime associate of Murray and, contemporaneous with the registration of the domain name, Teledrip was working with the registrant's company on joint promotions including an industry event and a promotional interview of Teledrip's then-CEO.

131.   115.Upon information and belief, Defendants intended to, and have,

diverted internet traffic from Plaintiff's website found at www.drips.com to

Defendants' website at www.teledrip.com.

## V.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### (Federal Trademark Infringement under 15 U.S.C. §1125(a) – Against Teledrip and Murray)

132.    ~~116.~~Plaintiff hereby incorporates by reference all prior allegations as though fully set forth herein.

133.    ~~117.~~The actions of Defendants described above and specifically, without limitation, their unauthorized use of the Drips Service Marks, and confusingly similar variations thereof, in commerce to advertise, promote, market, and sell Teledrip services and products throughout the United States, including Ohio, constitute trademark infringement in violation of 15 U.S.C. § 1125(a).

134.    ~~118.~~The actions of Defendants, if not enjoined, will continue. Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial consisting of, among other things, diminution in the value of the goodwill associated with the Drips Service Marks, and injury to Plaintiff's business. Plaintiff is therefore entitled to injunctive relief pursuant to 15 U.S.C. § 1116.

135.    ~~119.~~Pursuant to 15 U.S.C. § 1117, Plaintiff is entitled to recover damages in an amount to be determined at trial, ill-gotten profits made by Defendants on sales of product and services that were based on the Drips Holdings Service Mark and content, and the costs of this action. Furthermore, Plaintiff is informed and believes, and on that basis alleges, that the actions of Defendants were undertaken willfully

and with the intention of causing confusion, mistake, or deception, making this an exceptional case entitling Plaintiff to recover additional treble damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

## SECOND CAUSE OF ACTION

### (Federal Unfair Competition and False Advertising under 15 U.S.C. §1125(a) – Against Teledrip and Laible)

136. 120.Plaintiff hereby incorporates by reference all prior allegations as though fully set forth herein.

137. 121.Defendants' actions described above and specifically, without limitation, Defendants' use of the Drips Service Marks, and confusingly similar variations thereof, in commerce to advertise, market, and sell Teledrip's services throughout the United States, including Ohio; their use of misleading "comparison reviews"; and their misrepresentations regarding the Drips Services services, constitute unfair competition and false advertising in violation of 15 U.S.C. § 1125(a).

138. 122.Defendants' representations regarding Plaintiff's products and services are made in interstate commerce.

139. 123.Defendants' representations regarding Plaintiff's products and services are material to customers' purchasing decisions because they concern the source, functionality and performance of the parties' respective products and services.

140.  124.A significant portion of consumers are likely to be justifiably misled and deceived by Defendants' representations regarding Plaintiff's products and services and act in reliance upon them by doing business with Defendants.

141.  125.Defendants knew or should have known that their statements were false or likely to mislead.

142.  126.As an actual and proximate result of Defendants' willful and intentional actions, Plaintiff has suffered damages in an amount to be determined at trial, and unless Defendants are enjoined, Plaintiff will continue to suffer irreparable harm and damage to its business, reputation, and goodwill.

143.  127.Pursuant to 15 U.S.C. § 1117, Plaintiff is entitled to damages for Defendants' Lanham Act violations, an accounting for profits made by Defendants on sales of products and services that were rip-offs of the Drips Holdings products and services, as well as recovery of the costs of this action.

144.  128.Furthermore, Plaintiff is informed and believes, and on that basis alleges, that Defendants' conduct was undertaken willfully and with the intention of causing confusion, mistake or deception, making this an exceptional case entitling Plaintiff to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

**THIRD CAUSE OF ACTION**

**(Cybersquatting in violation of the ACPA, 15 U.S.C. §1125(d) – Against Teledrip)**

145. ~~129~~Plaintiff hereby incorporates by reference all prior allegations as though fully set forth herein.

146. ~~130~~Defendants' actions described above and specifically, without limitation, Defendants' use and registration of the Infringing Domain, drips.cm, violates the Anticybersquatting Consumer Protection Act, 15 U.S.C. §1125(d).

147. ~~131~~Upon information and belief, at the time Defendants registered the Infringing Domain or had it registered on their behalf, they knew about the Drips Marks, including drips.com, and had agreed to stop use of drips.io following Plaintiff's January 2017 objection.

148. ~~132~~Defendants have no legitimate purpose for choosing the .cm country-level domain; it is only useful to catch inattentive users who miss-type Plaintiff's www.drips.com web address into an internet browser.

149. ~~133~~Upon information and belief, Defendants have used the Infringing Domain to divert users from Plaintiff's website since December 2018 for their own financial gain.

150. ~~134~~As an actual and proximate result of Defendants' willful and intentional actions, Plaintiff has suffered damages in an amount to be determined at trial, and

unless Defendants are enjoined, Plaintiff will continue to suffer irreparable harm and damage to its business, reputation, and goodwill.

151.    105Pursuant to 15 U.S.C. § 1117, Plaintiff is entitled to an order transferring the domain name, actual damages or statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as well as recovery of the costs of this action.

152.    106Furthermore, Plaintiff is informed and believes, and on that basis alleges, that Defendants' conduct was undertaken willfully and with the intention of causing confusion, mistake or deception, making this an exceptional case entitling Plaintiff to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

## FOURTH CAUSE OF ACTION

### (Statutory Unfair Competition and False Advertising under Ohio Revised Code §§ 4165.01 *et seq*. – Against Teledrip and, Murray, and Laible)

153.    107Plaintiff hereby incorporates by reference all prior allegations as though fully set forth herein.

154.    108Defendants' actions described above and specifically, without limitation, Defendants' use of the Drips Service Marks, and confusingly similar variations thereof, in commerce to advertise, market, and sell Teledrip's services throughout the United States and Ohio; their use of misleading "comparison reviews"; and their misrepresentations regarding Plaintiff's products and services,

58

constitute trademark infringement, false advertising, and unfair competition in violation of the laws of the State of Ohio.

155.    139By these actions, Defendants have engaged in false advertising and unfair competition in violation of the statutory laws of the state of Ohio, Ohio Rev. Code §§ 4165.01, *et seq*., and, as a result, Plaintiff has suffered and will continue to suffer damage to its business, reputation, and goodwill.

156.    140As a direct and proximate result of Defendants' willful and intentional actions, Plaintiff has suffered damages in an amount to be determined at trial and, unless Defendants are restrained, Plaintiff will continue to suffer irreparable harm.

## FIFTH CAUSE OF ACTION

### (Tortious Interference with Business Relationships under Ohio common law – Against Teledrip and, Murray, and Laible)

157.    141Plaintiff hereby incorporates by reference all prior allegations as though fully set forth herein.

158.    142The actions of Defendants described above and specifically, without limitation, Defendants' use of the Drips Service Marks, and confusingly similar variations thereof, in commerce to advertise, market, and sell Teledrip's services throughout the United States and Ohio; their use of misleading "comparison reviews"; and their misrepresentations regarding Plaintiff's products and services, constitute tortious interference with business relationships under Ohio common law.

159.    143.Defendants knew of Drips Holdings' existing and prospective business relationships and intentionally directed their behavior to those customers, as shown by the way in which they intentionally and falsely positioned Teledrip as either the "same as" or possessing superior technology to Drips Holdings.

160.    144.Defendants took possession of and used Drips Holdings' confidential customer scripts when they knew or should have known that they were Drips Holdings' property and that the persons providing the scripts were not supposed to use them other than in the Drips platform.

161.    145.Defendant Murray knew or reasonably should have known that the information he obtained from Mr. Budd was confidential information of Drips Holdings and/or that Mr. Budd had an obligation to Drips Holdings not to disclose the same.

162.    146.Defendant Murray knew at the time he enticed Mr. Budd to participate in his revenge scheme that Mr. Budd's Element Networks was a client of Drips Holdings and that Murray's tortious actions described herein would cause Mr. Budd to move Element Networks' campaigns from Drips Holdings to Teledrip.

163.    147.Defendants have no justification or privilege for the infringing use of the Drips Service Marks by Teledrip, Teledrip's false and misleading statements to customers, using Drips Holdings' customer scripts, or enticing Mr. Budd/Element

Networks to breach their agreement with Drips Holdings and move their campaigns to Teledrip.

164. ~~140.~~As a proximate and direct result of the foregoing, Defendants have prevented Drips Holdings from forming contracts with potential customers and caused other contracts to be terminated.

165. ~~149.~~The actions of Defendants, if not enjoined, will continue. Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial consisting of, among other things, diminution in the value of and goodwill associated with the Drips Service Mark, and injury to Plaintiff's business.

166. ~~150.~~On information and belief, the actions of Defendants described above were and continue to be deliberate and malicious.

## SIXTH CAUSE OF ACTION

### (Business Disparagement under Ohio common law – Against Teledrip and Laible)

167. ~~151.~~Plaintiff hereby incorporates by reference all prior allegations as though fully set forth herein.

168. ~~152.~~The actions of Defendants described above and specifically, without limitation, their use of misleading and disparaging "comparison reviews" and their disparaging misrepresentations regarding Plaintiff's products and services, constitute business disparagement under Ohio common law and places Plaintiff in a false light.

63

169. 153Defendants knew of Drips Holdings' existing and prospective business relationships and intentionally directed their behavior to those customers, as shown by the way in which they intentionally and falsely positioned Teledrip as either the "same as" or possessing superior technology to Drips Holdings.

170. 154Defendants have no factual basis or justification for Teledrip's false and misleading statements to customers.

171. 155As a proximate and direct result of Defendants' disparaging statements, they have prevented Drips Holdings from forming contracts with potential customers and caused other contracts to be terminated.

172. 156The disparaging actions of Defendants, if not enjoined, will continue. Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial consisting of, among other things, diminution in the value of and goodwill associated with the Drips Service Mark, and injury to Plaintiff's business.

173. 157The actions of Defendants described above were and continue to be deliberate and malicious.

## SEVENTH CAUSE OF ACTION

### (Deceptive Trade Practices under Ohio Statutory Revised Code §§ 4165.02 *et seq*. and common law – Against Teledrip and Murray)

174. 158Plaintiff hereby incorporates by reference all prior allegations as though fully set forth herein.

175. ~~159.~~Defendants' acts constitute deceptive trade practices by passing off Teledrip's services as Drips Holdings' services and creating a likelihood of confusion as to the source of the services, in violation of Ohio Deceptive Trade Practices Act, O.R.C. § 4165.02 and Ohio common law. Plaintiffs are entitled to damages and attorneys' fees.

176. ~~160.~~Defendants' acts greatly and irreparably damage Plaintiffs and will continue to cause damage unless restrained by this Court. Plaintiff is without an adequate remedy at law.

## EIGHTH CAUSE OF ACTION

### (Misappropriation of Trade Secrets
### Ohio Revised Code §§ 1331.61 – 1333.69 – Against Teledrip, ~~and~~Murray, and Budd)

177. ~~161.~~All prior paragraphs in this Complaint are hereby incorporated by reference.

178. ~~162.~~Upon information and belief, Defendants obtained access to Drips Holdings' internal, proprietary work flow from persons, including Budd, who it knew owed a duty to Drips Holdings to refrain from unauthorized use of Drips Holdings' computer systems.

179. Budd provided to Murray, in violation of agreements he signed with Drips Holdings, confidential information regarding Drips Holdings' Campaign

Builder, scripts, reporting structure, pricing structure, and the optimal cadence, timing, and volume of messages determined by Drips Holdings based on its extensive experience with and refinement of the Drips platform.

180.    163.Upon information and belief, Defendants have actively worked to conceal the source of their misappropriated materials from Plaintiff by, among other things, adopting the alias "Dinesh Singh" for its founder (who has the common name

"Taylor Murray") and using a respectable "front man" as CEO to interact publicly with potential customers and the industry.

181.    164Drips Holdings enacted (depending on the version of the technology misappropriated by Defendant) between at least 4,000 – 8,000 "code commits," which are a way to tally each time the software code constituting the platform received significant updates and/or changes to the system and demonstrate the many iterations Drips Holdings went through to reach the organization and work flow misappropriated by Defendant.

182.    165Upon information and belief, no other competitor utilizes the type of user interface adopted by Drips Holdings or the detailed work flows created by Drips Holdings for its internal campaign building tool, which were reached following hours of development time and based on Drips Holdings' actual work with customers in the lead generation field. By contrast, competitors (other than Teledrip) have adopted a more simplistic, flow chart style for their user interfaces.

183.    166Drips Holdings' confidential user interface, detailed work flows, and customer scripts have independent economic value because they are not generally known or readily ascertainable by proper means from persons other than Drips Holdings. It would take a person experienced in the lead generation field thousands of hours of work to reach the depth and sophistication of Drips Holdings' user interface and detailed work flows, which address the many unexpected issues that

arise in AI-driven lead generation that can only be recognized through experience implementing a solution. It would take a person a great deal of trial and error and analysis to develop and optimize customer scripts like those Drips Holdings' scripts taken and used by Teledrip.

184. 167.Defendants took possession of and used Drips Holdings' confidential user interface, detailed work flow, and customer scripts when they knew or should have known that they were Drips Holdings' property and that the persons providing them were not supposed to use them other than in the Drips platform.

185. 168.Drips Holdings has enacted reasonable measures to protect the confidentiality of its user interface, detailed work flows, and customer scripts, including but not limited to entering into written agreements with customers that prohibit the unauthorized use of Drips Holdings' computer systems.

186. 169.Defendants' misappropriation, as described herein, has caused actual damages to Drips Holdings, including but not limited to diminution of its good will and its business advantages.

187. 170.Defendants' misappropriation, as described herein, was willful and malicious within the meaning of R.C. 1333.63, thereby justifying punitive damages, and justifying attorney's fees pursuant to R.C. 1333.64(C).

**NINTH CAUSE OF ACTION**

**(Misappropriation of Trade Secrets**
**18 U.S.C. § 1836– Against Teledrip, Murray, and Budd)**

188.    All prior paragraphs in this Complaint are hereby incorporated by reference.

189.    Upon information and belief, Defendants obtained access to Drips Holdings' internal, proprietary work flow from persons, including Budd, who it knew owed a duty to Drips Holdings to refrain from unauthorized use of Drips Holdings' computer systems.

190.    Budd provided to Murray, in violation of agreements he signed with Drips Holdings, confidential information regarding Drips Holdings' Campaign Builder, scripts, reporting structure, pricing structure, and the optimal cadence, timing, and volume of messages determined by Drips Holdings based on its extensive experience with and refinement of the Drips platform.

191.    Upon information and belief, Defendants have actively worked to conceal the source of their misappropriated materials from Plaintiff by, among other things, adopting the alias "Dinesh Singh" for its founder (who has the common name "Taylor Murray") and using a respectable "front man" as CEO to interact publicly with potential customers and the industry.

192.    Drips Holdings enacted (depending on the version of the technology misappropriated by Defendant) between at least 4,000 – 8,000 "code commits," which are a way to tally each time the software code constituting the platform received significant updates and/or changes to the system and demonstrate the many iterations Drips Holdings went through to reach the organization and work flow

misappropriated by Defendant.

193.     Upon information and belief, no other competitor utilizes the type of user interface adopted by Drips Holdings or the detailed work flows created by Drips Holdings for its internal campaign building tool, which were reached following hours of development time and based on Drips Holdings' actual work with customers in the lead generation field. By contrast, competitors (other than Teledrip) have adopted a more simplistic, flow chart style for their user interfaces.

194.     Drips Holdings' confidential user interface, detailed work flows, and customer scripts have independent economic value because they are not generally known or readily ascertainable by proper means from persons other than Drips Holdings. It would take a person experienced in the lead generation field thousands of hours of work to reach the depth and sophistication of Drips Holdings' user interface and detailed work flows, which address the many unexpected issues that arise in AI-driven lead generation that can only be recognized through experience implementing a solution. It would take a person a great deal of trial and error and analysis to develop and optimize customer scripts like those Drips Holdings' scripts taken and used by Teledrip.

195.     Defendants took possession of and used Drips Holdings' confidential user interface, detailed work flow, and customer scripts when they knew or should have known that they were Drips Holdings' property and that the persons providing them were not supposed to use them other than in the Drips platform.

70

196.    Drips Holdings has enacted reasonable measures to protect the confidentiality of its user interface, detailed work flows, and customer scripts, including but not limited to entering into written agreements with customers that prohibit the unauthorized use of Drips Holdings' computer systems.

197.    Defendants' misappropriation, as described herein, has caused actual damages to Drips Holdings, including but not limited to diminution of its good will and its business advantages.

198.    Defendants' misappropriation, as described herein, was willful and malicious, thereby justifying punitive damages, and justifying attorney's fees pursuant to 18 U.S. Code § 1836.

## VI.    PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment against Defendants as follows:

A.     That Plaintiff be granted injunctive relief under 15 U.S.C. § 1051 *et seq.*; Ohio Revised Code § 4165.03 and Ohio common law; specifically, that Defendants and all of their respective officers, agents, servants, representatives, employees, attorneys, and all other persons acting in concert with them be enjoined from:

1.     using the Drips Service Marks, or any mark confusingly similar to the Drips Service Marks, in connection with the marketing, promotion, advertising, sale, or distribution of any Teledrip products or services;

2.     directly or indirectly engaging in false advertising or promotion of Teledrip products and services;

3.     making or inducing others to make any false, misleading or deceptive statement of fact, or representation of fact in connection with the promotion, advertisement, packaging, display, sale, offering for sale, manufacture, production, circulation or distribution of Teledrip products by making false representations regarding Plaintiff's products and services;

4.     registering and/or using any domain name that is identical or confusingly similar to any Drips Service Mark and

5.      directly or indirectly engaging in deceptive trade practices by passing off and creating a likelihood of confusion.

B.      That Defendants file, within ten (10) days from entry of an injunction, a declaration with this Court signed under penalty of perjury certifying the manner in which Defendants have complied with the terms of the injunction;

C.      That Defendants be ordered to correct any erroneous impression persons may have derived concerning the nature, characteristics, or qualities of either Teledrip products vis-a-vis Plaintiff's Drips Service Marks products, including without limitation corrective advertising.

D.      That Defendants be adjudged to have violated 15 U.S.C. § 1125(a) by unfairly competing against Plaintiff by using false, deceptive or misleading descriptions or representations of fact that misrepresent the nature, quality, and characteristics of Plaintiff's products and services;

E.      That Defendants be adjudged to have violated 15 U.S.C. § 1125(d) by registering and/or using the domain name drips.cm;

F.      That Defendants be adjudged to have unlawfully and unfairly competed against Plaintiff under the laws of the State of Ohio, Ohio Revised Code § 4165.01, *et seq*.;

G.      That Defendants be adjudged to have tortiously interfered with

73

Plaintiff's business relationships under Ohio common law;

H.     That Defendants be adjudged to have engaged in deceptive trade practices of passing off and creating a likelihood of confusion.

I.     That Plaintiff be awarded damages pursuant to 15 U.S.C. § 1117(a) and (d), sufficient to compensate it for the damage caused by Defendants' violations of the Lanham Act;

J.     That Plaintiff be awarded Defendants' profits derived by reason of said acts, or as determined by said accounting;

K.     That such damages and profits be trebled and awarded to Plaintiff and that it be awarded its costs, attorneys' fees and expenses in this suit under 15 U.S.C. § 1117, as a result of Defendants' willful, intentional, and deliberate acts in violation of the Lanham Act;

L.     That Plaintiff be awarded damages in an amount sufficient to compensate it for the damage caused by Defendants' unfair competition and false advertising under Ohio Revised Code § 4165.01, *et seq*. and tortious interference with business relationships and business disparagement under Ohio common law; deceptive trade practice pursuant to Ohio Revised Code § 4165.02, *et seq*. and Ohio common law, and trade secret misappropriation under Ohio Revised Code §§ 1331.61 – 1333.69.

M.     That Plaintiff be awarded damages in an amount sufficient to compensate it for the damage caused by Defendants' misappropriation of Plaintiff's

trade secrets under 18 U.S.C § 1836, including but not limited to Defendants' unjust enrichment, Plaintiff's actual damages, and a reasonable royalty based on Defendants' use of Plaintiff's trade secrets.

     N.     M. The Plaintiff be granted punitive damages for Defendants' malicious acts;

O.   ~~N.~~That Plaintiff be granted pre-judgment and post-judgment interest;

P.   ~~O.~~That Plaintiff be granted costs associated with the prosecution of this

action;

Q.   That Plaintiff be granted its attorneys' fees;

R.   ~~P.~~That Plaintiff be granted such further relief as the Court may deem just.

## VII.  <u>**JURY TRIAL DEMANDED**</u>

Plaintiff demands a trial by jury on all triable issues of fact.

Dated: ~~July 17~~August 5, ~~2020~~2021

/s/Christina J. Moser
Deborah A. Wilcox (0038770)
Email:      dwilcox@bakerlaw.com
Christina J. Moser (0074817)

Email:        cmoser@bakerlaw.com
Ruth E. Hartman (78860)
Email:        rhartman@bakerlaw.com
Sarah E. Spring (100252)
Email:        sspring@bakerlaw.com
BAKER & HOSTETLER LLP Key
Tower

127 Public Square, Suite 2000
Cleveland, OH 44114-1214
Telephone: 216.621.0200
Facsimile:    216.696.0740

Uri Litvak (admitted *pro hac vice*)
Litvak Law Group, PC 2424 SE
Bristol St., Ste. 300 Newport
Beach, CA 92660-0764 (949)
477-4900 (telephone)
(949) 335-7113 (facsimile)
ulitvak@litvaklawgroup.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on counsel

of record in this case via the Court's Electronic Filing System.


                                   _/s/Christina J. Moser_____
                                         Counsel for Plaintiff