IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DRIPS HOLDINGS, LLC, | ) CASE NO. 5:19-CV-02789-JRA |
| Plaintiff, | ) JUDGE JOHN R. ADAMS ) UNITED STATES DISTRICT COURT |
| v. | ) ) MAGISTRATE JUDGE |
| TELEDRIP LLC, TAYLOR MURRAY, AN INDIVIDUAL; AND DOES, 1 - 5, INCLUSIVE; | ) CARMEN E. HENDERSON ) ) **REPORT & RECOMMENDATION on** ) **Plaintiff's Motion for Sanctions** |
| Defendants, | |

I.  Introduction

Before the Court is the motion of Plaintiff Drips Holdings, LLC ("Drips" or "Plaintiff") requesting that the Court sanction Defendants Teledrip and Taylor Murray (collectively, "Defendants") for their spoliation of Slack data.[1] (ECF No. 129). Defendants opposed (ECF No. 132) and Drips replied (ECF No. 134). For the reasons set forth herein, the Court recommends that the motion be granted IN PART.

II.  Facts

From 2017 to present, Teledrip has used Slack as a typical mode of communication for both internal communications as well as customer communications. On October 25, 2019, Murray downloaded a portion of the Slack data, which did not include Slack channels containing internal

---

[1] Slack "is a popular messaging system" that functions as a "'team collaboration tool' that allows users to message, share files, search conversations, archive information, and more[.]" Lawyer's Guide to Discovery and Investigations in Slack, https://logikcull.com/slack (last visited March 23, 2022).

1

communications. On October 28, 2019, Murray changed the retention setting of Teledrip's Slack from unlimited to seven days and deleted the previously exported Slack data. On November 26, 2019, Drips brought the instant action and the following day Teledrip received a litigation hold letter from Drips along with service of the complaint. Teledrip did not change the seven-day retention policy for its Slack communications until September 2020.

III.  Law

Drips moved for sanctions pursuant to Federal Rule of Civil Procedure 37(e)(2) for the Defendants' spoliation of Slack data through September 2020. Rule 37 imposes a duty on litigants to preserve information in anticipation of and during the conduct of litigation and empowers the Court to issue sanctions against a party who intentionally destroys or fails to preserve evidence, including a presumption that the lost information was unfavorable to the party or a jury instruction that an adverse inference should be drawn from the destruction of or failure to preserve the evidence. Fed. R. Civ. P. 37(e)(2)(A)-(C). "Spoliation is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction." *United States v. Boxley*, 373 F.3d 759, 762 (6th Cir. 2004) (citing *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 804 (6th Cir. 1999)). To warrant sanctions for the spoliation of evidence, the movant must show: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. U.S. Dept. of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (emphasis added) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

2

The Sixth Circuit has stated that the duty to preserve attaches when the party "has notice that the evidence is relevant to litigation or should have known that the evidence may be relevant to future litigation." *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (citation omitted).

A party seeking the more severe sanction under of an adverse inference instruction under Rule 37(e)(2) must show that evidence was destroyed with the " 'intent' to deprive [the moving party] of the information's use." *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016) (quoting Fed. R. Civ. P. 37(e)); *Courser v. Michigan House of Representatives*, 831 F. App'x 161, 188 (6th Cir. 2020). "A showing of negligence or even gross negligence will not do the trick." *Id.* (citing Fed. R. Civ. P. 37, 2015 Advisory Comm. Note); *Courser*, 831 F. App'x at 188. Rule 37(e)(2)'s Advisory Committee Notes explain that "[f]inding an intent to deprive another party of the lost information's use in the litigation does not require a court to adopt any of the measures listed in subdivision (e)(2)." Finally, the Advisory Committee Notes provide that "[c]ourts should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant." Fed. R. Civ. P. 37(e), Advisory Comm. Note., 2015 Amendment.

IV. Analysis

A. Duty to Preserve

A party's duty to preserve evidence must be triggered by an event that places the party on "notice that the evidence is relevant to litigation or ... should have known that the evidence may be relevant to future litigation." *John B.*, 531 F.3d at 459 (internal citations omitted). Initially, Drips attempts to argue that Defendants' duty to preserve the Slack data was triggered as early as January 17, 2017 when Lead Science LLC, Drips's predecessor-in-interest, sent a cease-and-desist letter to Drips.io. (ECF No. 129-8). In the letter, Lead Science demanded that drips.io: "1. Cease and desist from any and all attempts to copy, scrape, or otherwise collect content from

3

www.drips.com; 2. Cease and desist from using the mark 'Drips' in connection with automation services that your company may offer; 3. Take down any content from the www.drips.io website relating to automation services; and 4. Confirm in a writing signed by an officer of www.drips.io that www.drips.io has complied with all of the foregoing demands and that www.drips.io will not in the future engage in any similar activities." (ECF No. 129-8 at 3). On January 25, 2017, drips.io, through Murray, confirmed that it would remove the drips.io website and move to a different domain. Drips was thereafter formed in August of 2017 (ECF No. 67 at ¶ 16) and Teledrip was formed in or around March of 2017 (ECF No. 67 at ¶ 17, ECF No. 69 at ¶ 17).

      Based on the evidence provided, Drips has not established that Defendants should have been on notice that Teledrip's Slack data dating back to 2017 may be relevant to future litigation. Drips acknowledges that Murray took down the drips.io website and registered instead under "drip.ai". This simple change may seem insignificant, but it arguably complied with the demands of the cease-and-desist letter and Drips itself did not take issue with the new domain until September of 2019. Moreover, the Court is persuaded by Defendants' argument that it had "no basis for believing that it would be sued over the use of the TELEDRIP name" (ECF No. 132 at 11) given the United States Patent and Trademark Office's rejection of Drips's applications to trademark the "Drips" logo, character mark, and service mark as merely descriptive and generic. (ECF No. 132-1[2], 132-2, 132-4).

---

[2] The letter of refusal explained:

Next, Drips presents evidence that Defendants contemplated the possibility of a trademark dispute with Drips no later than August of 2019. In August 2019, Teledrip attended a trade show and had a booth advertising its services. Teledrip's advertising panels included the phrase "Conversational SMS". Drips had recently trademarked the phrase "Conversational SMS" and, in light of this, Christopher Moreira, a Teledrip member, instructed that the Teledrip panels using that phrase be taken down. Moreira discussed his concerns about using the trademarked phrase with Murray[3] via Slack. A screenshot of a conversation between Moreira and Murray on Slack shows Murray acknowledging the possibility of a trademark dispute. (ECF No. 129-24). Further, Murray admits that he discounted potential disputes related to Drips's "Conversational SMS"

---

In this case, the proposed mark is descriptive of applicant's services and does not create a unique, incongruous, or non-descriptive meaning in relation to the services. Specifically, DRIPS is the plural of DRIP and refers to DRIP marketing also known as automated email campaign, lifecycle emails, autoresponders and marketing automation-the concept is the same: they're a set of marketing emails that will be sent out automatically on a schedule. Another definition indicates that "Drip marketing is a plan for communicating information about a company through a steady stream of marketing messages, including emails, social media posts, postcards, phone calls, brochures, and printed newsletters". (See attached evidence)

The applicant has identified its services as "Advertising and marketing services, namely, providing an application platform as a service that optimizes delivery modality and liming parameters to mobile devices, related to communications via SMS, voice, e-mail, direct mail and MMS to promote the goods and services of others". Thus while the application is based on Intent To Use (ITU) it appears that the applicant is using or intends to provide platform or software as a services providing drips in support of drip marketing efforts as part of its advertising, marketing and promotional campaign services.

As the proposed mark immediately conveys information concerning a feature, function, use, purpose, subject matter and/or characteristic of applicant's services the mark is merely descriptive and registration is refused.

(ECF No. 132-1 at 6-7).

[3] AKA "Dinesh Singh".

trademark when he and Moreira disagreed about Teledrip's trade show booth in August 2019. (*See* ECF No. 134-2, Dep. of T. Murray, at 311:9–312:15.)

Defendants' argument that it could not have reasonably foreseen a lawsuit because Drips itself was not aware of its claims against Teledrip until late September 2019 is unpersuasive. Teledrip, through Murray, was admittedly aware that it was potentially infringing on a trademark belonging to Drips as early as the August 2019 trade show. Accordingly, Defendants' duty to preserve the Slack data was triggered no later than August of 2019 as it was reasonably foreseeable that Defendants faced a trademark dispute with Drips at that time.

B. Culpable State of Mind

Drips argues that Defendants' intentional destruction/loss of the Slack data is evidenced by Defendants' October 28, 2019 change of Teledrip's Slack retention settings from indefinite to a seven-day retention period and deletion of all Slack data up to that point (except for the export that did not contain internal channels) (ECF No. 129 at 16-17; ECF No. 129-31), and by Defendants' failure to alter the Slack retention settings until September 2020 despite receiving a litigation hold letter from Drips's counsel on November 27, 2019.[4]

Defendants do not dispute resetting the retention time frame or deleting 564 KB of data downloaded on October 28, 2019. Instead, Defendants state that "Teledrip changed its data retention settings with a good faith belief that it minimized liability for the theft or disclosure of its customer's confidential information, as it had recently been trained on these issues under the

---

[4] Drips argues that Defendants intentional destruction of the Slack data and change in the retention policy is supported by the timing of a written demand letter from Moreira's attorney and potential litigation from Moreira and another former member, Budd. However, as the culpable mental state analysis requires the Court to determine that Defendants intentionally deprived the *movant* of the information, Defendants' actions taken to deprive other potentially aggrieved parties will not be considered.

[California Consumer Privacy Act ("CCPA")] and [International Standard of Operation Compliance ("ISO")] 27001." (ECF No. 132 at 12). Thus, there is no dispute that the destruction of the Slack data was intentional. Defendants' argument, however, is that they did so for a legitimate purpose.

Neither the CCPA nor the ISO required the destruction of the Slack data. The ISO is an independent, non-governmental international organization whose purpose is to "bring[] together experts to share knowledge and develop voluntary, consensus-based, market relevant International Standards that support innovation and provide solutions to global challenges." https://www.iso.org/about-us.html, (last visited 3/28/2022). The second edition of ISO 27001 was published October 1, 2013 and reconfirmed in 2019. (*See* ECF No. 134-7 at 2; *see also* ISO/IEC 27001:2013 INFORMATION TECHNOLOGY — SECURITY TECHNIQUES — INFORMATION SECURITY MANAGEMENT SYSTEMS — REQUIREMENTS, https://www.iso.org/standard/54534.html, (last visited 3/28/2022)). Defendants do not indicate what part of ISO 27001 they relied on for the destruction of the Slack data. However, section A.18.1.3 of the Annex specifically addresses the protection of records and states that "[r]ecords shall be protected from loss, destruction, falsification, unauthorized access and unauthorized release, in accordance with legislatory, regulatory, contractual and business requirements." (ECF No. 134-7 at 28). In fact, several of the objectives identified in ISO 27001 exits for the protection against loss of data. (ECF No. 134-7 at 19 (A.8.3 Media Handling objective "To prevent unauthorized disclosure, modification, removal or destruction of information stored on media."), 23 (A.12.3 Backup objective "To protect against loss of data."), and 28 (A.18.1 Compliance with legal and contractual requirements objective "To avoid breaches of legal, statutory, regulatory or contractual obligations related to information

7

security and of any security requirements.")). It is unclear what part of ISO 27001 Defendants felt required them to delete all prior data, especially after being put on notice of potential litigation.

Reportedly, in August and September 2019, Teledrip partners and employees underwent a series of trainings, including training on ISO compliance. One video referenced by Defendants in support, "specifically mentioned Slack as an example of a platform in which personal identifiable information may be unsecure." (ECF No. 132 at 8). Defendants assert that they were specifically concerned with Teledrip's clients' credit card information remaining on Slack. (ECF No. 132 at 8). Defendants do not provide a transcript of the video for the Court to review, and the transcript provided by Drips does not support Defendants' argument. (ECF No. 134-4). Although the transcript references data retention, it does not reference ISO and actually references the requirement for the retention of data for specific periods (such as six-years for HIPAA).

Defendants' reliance on CCPA as requiring such disposal of evidence is likewise unavailing. Defendants explain that they elected to change all Slack channels to seven-day retention "to protect [Teledrip's] client's privacy and comply with the Act" by acting "in the simplest way: simply not retaining information that could expose it to liability or onerous safekeeping requirements." (ECF No. 132 at 8). Nothing in the CCPA cited by Defendants, nor found by this Court, directs businesses to delete customer information. Instead, protection of private information is required.[5] Defendants' "goal of protecting consumer information could have

---

[5] The CCPA went into effect on January 1, 2020. CA Civil § 1798.100. The CCPA created obligations on a business that "controls the collection of a consumer's personal information," such as the duty to inform consumers of "the categories of personal information to be collected." CA Civil § 1798.100. The CCPA also creates a civil cause of action if a business fails to store information properly and that information is stolen: "[a]ny consumer whose nonencrypted and nonredacted personal information, . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action." CA Civil § 1798.150.

been accomplished by far less drastic measures." (ECF No. 134 at 15). Even if Defendants believed that the CCPA required the destruction of customer information, Defendants went well beyond deleting customer data when Murry changed the retention policy for both customer channels and internal channels.

Although the Defendants' explanation for changing Teledrip's Slack retention policy in October 2019 is doubtful, it is plausible. Nonetheless, Defendants' failure to change the retention policy upon receipt of the litigation hold letter and notice of the lawsuit is inexcusable. Defendants received service of the instant lawsuit on November 27, 2019 and received a litigation hold letter from Drips the same day. Despite this, Defendants failed to change the Slack retention settings from the seven-day period until September 2020. As a result, Defendants did not preserve any Slack messages for ten months during this litigation. As an explanation for their failure, Defendants state that "Murray was confused on the interaction between the litigation hold required for this lawsuit and CCPA and ISO compliance [and thus,] did not immediately change his Slack retention settings from the recently set seven-day retention window." (ECF No. 132 at 10). Even if "confusion" was a viable excuse for failing to preserve the Slack data, Defendants could have, and should have, addressed any confusion regarding the litigation hold with their attorneys who became involved in the litigation at least by December 17, 2019. Moreover, Defendants' counsel was clearly aware at least by May 13, 2020 that Defendants had implemented and continued to maintain a seven-day destruction policy despite there being active litigation. (ECF No. 129-35). Despite having a clear duty to preserve evidence, Defendants continued to destroy potential evidence for ten months, until September 2020. Defendants' refusal to abide by the litigation hold letter, or seek clarification from their attorney, strongly suggests that the earlier change in policy was not an innocent change of policy to comply with ISO or CCPA requirements.

9

For all these reasons, this Court recommends that the Court find that the Defendants knowingly spoliated the Slack data with the intent to deprive Drips from discovering its content.

C. Relevancy

The Court next must consider whether the lost/destroyed evidence is relevant to Drips's claims or defenses. "[T]he party seeking the adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 514 (6th Cir. 2014).

Drips argues that the lost Slack data is relevant as it is undisputed that Slack was the main method of communication between Teledrip employees. Thus, Drips argues that it is highly likely that the data would have contained discussions regarding Murray's intent to promote customer confusion between Teledrip and Drips, customer impressions of Teledrip and Drips, competition between Teledrip and Drips, and Teledrip's intent to copy and imitate Drips's marketing and promotional activities.

Evidence supports Drips's argument that the lost data likely contained evidence that would support its claims. A screen shot taken by former Teledrip employee Moreira of a Slack chat with Murray shows a conversation relating to Murray having an "ax[] to grind" with Drips's owner. (ECF No. 129-23). This reference comes following Moreira expressing concern regarding messaging that was on Teledrip's booth that he believed violated a copyright owned by Drips. Moreira also appears to plead with Murry to stop "stok[ing] the situation" and references that the name "Teledrip" was not, as Murray has argued, a decision made all members, but rather a decision made by Murray (ECF No. 129-23 ("the only reason we're teledrip at all >> is bc thats what taylor wanted >> bc you have an axe to grind with ac or drips or whatever >> but grinding axes from

10

the shadows through your puppets is not a way to build solid business relationships")). Although this is only a single screen shot, it is reasonable to assume based on the language therein, that additional references to Murray's conflict with Drips were mentioned prior to and following this excerpt. In fact, Moreira testified that there were several Slack channels on which Teledrip employees internally discussed competing with Drips: the sales team chat, developers, a collective chat, and direct chats as well. (ECF No. 129-10 at 15). Moreira testified that they discussed feedback from customers who were "split testing", the rumors regarding Drips suing Teledrip, and discussions about Drips's online presence and marketing. (ECF No. 129-10 at 16-18). At least two other Teledrip employees verified that Slack was the primary mode of communication used by Teledrip. (*See* ECF No. 129-20, Dep. of R. Hernandez, at 238:18 ("For company business we would use Slack."); ECF No. 129-21, Dep. of M. Fernandez, at 46:5–9 ("[P]rimarily Slack . . . ")). John Budd, was working with Drips and Teledrip around the same time, also communicated via Slack with Murray in the development of Teledrip. Budd used Slack to provide Murray with screenshots of the Drips platform. (ECF No. 129-3, Dep. of J. Budd, at 80:22-83:22). Of course, no one can verify what the Slack messages or conversations actually entailed because Murray deleted this data.

This Court finds that the spoliated evidence from Teledrip's Slack data would likely have contained evidence relevant to Drips's claims of trademark infringement, unfair competition, false advertising, misappropriation of trade secrets, tortious interference, business disparagement, and deceptive trade practices.

D. Sanctions

Finally, having determined that Defendants spoliated relevant Slack data, this Court must recommend whether sanctions are appropriate and to what extent. Drips requests that the Court

11

sanction Defendants for their spoliation of evidence in the form of a non-rebuttable presumption and, ultimately, a jury instruction that an adverse inference should be drawn from Defendants' destruction of the Slack data. (ECF No. 129 at 18). For the reasons that follow, this Court recommends that the Court grant Drips's request in part. Instead of a non-rebuttable presumption or mandatory adverse-inference, this Court recommends that the more appropriate sanction is a permissive adverse-inference instruction.

"An adverse inference is an inference that the party fears producing the evidence; and this fear is some evidence that the circumstances or document or witness, if brought, would have exposed facts unfavorable to the party." *Flagg v. City of Detroit*, 715 F.3d 165, 177 (6th Cir. 2013) (internal quotation marks and brackets omitted). Whether "an adverse inference is permissive or mandatory is determined on a case-by-case basis, corresponding in part to the sanctioned party's degree of fault." *Id*. at 178.

"The permissive inference is 'simply a formalization of what the jurors would be entitled to do even in the absence of a specific instruction.'" *Crown Battery Mfg. Co. v. Club Car, Inc*., 185 F. Supp. 3d 987, 1003 (N.D. Ohio 2016) (quoting *West v. Tyson Foods, Inc*., 374 Fed. Appx. 624, 635 (6th Cir. 2010)). "Because the instruction comes 'dressed in the authority of the court,' it has 'more weight than if merely argued by counsel.'" *Id*. (quoting *Arch Ins. Co. v. Broan-NuTone, LLC*, 509 F. App'x 453, 459 (6th Cir. 2012)). Permissive inferences are "particularly appropriate if the evidence was not destroyed intentionally." *Id*.

"A mandatory-inference instruction, in contrast, requires that the jury infer a given fact." *Id*. "It is appropriate when, for example, a litigant's destruction of evidence 'severely compromised' its opponent's case 'by depriving [the opponent] of the most relevant piece of evidence to prove their claims.'" *Id*. (quoting *Beaven*, supra, 622 F.3d at 555).

12

Courts are given "broad discretion to craft proper sanctions for the spoliation of evidence." *Adkins v. Wolaver*, 692 F.3d 499, 503 (6th Cir. 2012). A spoliation sanction's "severity should correspond to the district court's finding after a fact-intensive inquiry into a party's degree of fault under the circumstances, including the recognition that a party's degree of fault may range from innocence through the degrees of negligence to intentionality." *Beaven*, 622 F.3d at 554 (internal quotation marks and citation omitted). "A proper sanction both levels the playing field and punishes the wrongdoer by placing 'the risk of an erroneous judgment on the party that wrongfully created the risk.'" *Crown*, 185 F. Supp. 3d at 995 (quoting *Roth v. Sloan*, 2011 WL 1298498, *3 (N.D. Ohio 2011).

Defendants argue that sanctions are not warranted because Drips has other evidence that can serve as a "reasonable substitute" for the spoliated evidence. (ECF No. 132 at 23). Defendants argue that Drips can rely on the screenshots taken by Moriera as well as the deposition testimony from Teledrip's members, during which Drips asked them about the content of the Slack messages. (ECF No. 132 at 23). Drips argues that extreme sanctions are warranted as it "will be severely prejudiced in its ability to prove its case by this lack of the key communications through which TeleDrip conducted all of its internal business. Because of Murray, Drips does not have copies of the Drips screen shots Budd sent to Murray. [ ]Drips' ability to counter Murray's claims that he was not the primary decision maker on Defendants' copycat marketing campaigns is limited. [ ] And Defendants' witnesses will try to downplay the significance of their targeting of Drips above all other competitors, which its Slack data would have undermined." (ECF No. 129 at 18).

The evidence that Defendants argue is a reasonable substitute for the missing evidence is the very same evidence that establishes why it is reasonable to assume that the destroyed Slack data would have included more conversations that reflected poorly on Defendants and were

13

relevant to Drips's claims. It is reasonable to assume that this small sampling of conversations are just the "tip of the iceberg" of what would have been uncovered had Defendants preserved the evidence. Additionally, Defendants' failure to revert the Slack retention settings upon notice of the lawsuit is inexcusable. Thus, this Court recommends that sanctions, at least to some degree, are warranted.

In *Crown*, the court found that a mandatory inference was warranted because the spoliated evidence left the plaintiff without the means to defend against breach of warranty claims. *Crown*, 185 F. Supp. 3d at 1003 (comparing *Gilley v. Eli Lilly & Co.*, 2013 WL 1701066, *7–9 (E.D. Tenn. 2013) (fact that defendant had access to printed copies of digital images that plaintiff destroyed militated in favor of permissive inference); *Flagg v. City of Detroit*, 2011 WL 4634245, *8 (E.D. Mich. 2011) (mandatory-inference instruction against defendant too harsh where plaintiffs "have been given a lengthy discovery period, and the Court has afforded them considerable latitude in exploring avenues of discovery," but plaintiffs failed to show missing documents were "especially fertile ground of relevant evidence"), aff'd, 715 F.3d 165 (6th Cir. 2013)). In *Beaven*, the Sixth Circuit affirmed a district court's spoliation sanction of a mandatory inference explaining that "Defendants' destruction of the [evidence] 'severely compromised' the Plaintiffs' case by depriving the Plaintiffs of the most relevant piece of evidence to prove their claims." 622 F.3d at 555. *Beaven* also explained that "an adverse inference is usually only permissive for the factfinder, not mandatory..." *Beaven*, 622 F.3d at 555.

Above, this Court stated that Defendants' destruction of and failure to preserve the Slack data was intentional. Although a mandatory adverse-inference instruction is certainly permissible (*see Crown*, 185 F. Supp. 3d at 1003), it is not required (*see* Fed. R. Civ. P. 37(e), Advisory Comm. Note., 2015 Amendment). The evidence in this case supports a permissive adverse-inference

14

instruction. Defendants' explanation for changing the Slack retention settings in October 2019 as a measure to ensure compliance with ISO and the CCPA (which was going to become effective in January 2020) is plausible, albeit convenient. Moreover, this Court does not believe that Drips is so severely prejudiced by the lack of the Slack data that its case is "severely compromised" without it. Drips may still attempt to present the evidence of the screen shots and text messages, and it has the testimony of the Teledrip employees who have stated that Slack was used to talk about Teledrip's decisions with regard to competing with Drips. Finally, Drips has not argued that absent this evidence it cannot prove its claims. (*See* ECF No. 129 at 18).

Accordingly, the jury should be given a permissive adverse-inference instruction that it *may* infer from the fact Defendants failed to preserve evidence, that the evidence would have proved a fact adverse to the defense of the litigation. *Crown*, 185 F. Supp. 3d at 1003.

V. Conclusion

After reviewing the facts, arguments, and relevant law, this Court finds that Defendants had a duty to preserve the Slack data beginning in August of 2019 when it was on notice of or should have had notice of potential litigation from Drips. The Court finds that Defendants failed to preserve the Slack data in order to deprive Drips of the evidence. Moreover, the Court finds that the deleted/lost Slack data was relevant to Drips's claims and/or defenses. Finally, this Court finds that a permissive adverse-inference instruction balances the interests of the parties and adequately punishes Defendants' culpable behavior. *See Arch Ins. Co. v. Broan-NuTone, LLC*, 509 F. App'x 453, 459 (6th Cir. 2012).

VI. Recommendation

For the reasons set forth above, this Court recommends that the District Court GRANT IN PART Drips's motion for spoliation sanctions and include a permissive adverse-inference jury instruction addressing the spoliated Slack data.

Dated: April 5, 2022

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019).